FRANCIS A. BALDWIN AND JAMES L. BALDWIN v. JOHN M. SHANNON.

1. Where a tract of land is plotted upon a map as containing fifty lots, forty-eight of which appear as regular lots with a width of twenty-five feet, and two of which are the divided remnant of what remained of the entire tract after plotting the regular lots, and it happens that the tract is too small to leave two lots as wide as they appear upon the map after giving the regular lots their full width. *Held*, that the holders of a title to the regular lots as they are plotted upon the map are enti-tled to the full twenty-five feet, and the width of the irregular lots must be diminished.

2. Evidence of practical location is permissible only where there is an ambiguity in the description or uncertainty in its application to the premises granted or where the location operates as an *estoppel in pais*.

3. The power of a judge to order a non-suit or direct a verdict, does not depend upon the absence of all *testimony in opposition to the* case in favor of which the ruling is made, but the test is whether there is any testimony from which the jury can reasonably conclude that the facts sought to be proven are established.

On rule to show cause why a verdict should not be set aside and a new trial granted.

The verdict was returned for the plaintiffs by direction of the trial judge. The facts involved in the cause sufficiently appear in the opinion.

Argued at February Term, 1880, before Justices WOOD-HULL and REED.

For the rule, *J. B. Vredenburgh* and *H. C. Pitney*.

*Contra*, *J. Weart*.

The opinion of the court was delivered by

REED, J. This action of ejectment involves the title to a strip of land in Jersey City, fronting ten feet on Palisade avenue. The properties of the plaintiff and of the defendant adjoin, and the title to the property of each is derived from the same source originally, namely, the owners of what was known as the Coles estate tract. The deeds of each party convey lots as delineated upon a certain map.

This map subdivides into lots an entire tract of land lying between Hoboken and Palisade avenues. It is a long and somewhat wedged-shape piece of ground, commencing at a well-known line, called the Passman line, and narrowing gradually as it runs in a southerly direction between Palisade and Hoboken avenues, until it strikes Hoboken avenue on the south, which avenue, having made a sharp turn and crossed

Palisade avenue, becomes the southerly as well as westerly boundary of the tract.

The map was made by Clerk and Bacot, in 1851, and it subdivided the tract of land just mentioned into fifty lots running from Palisade avenue back to Hoboken avenue.

The lots were numbered on the map from No. 13, the most westerly lot, by alternate numbers, to No. 113, the most easterly lot, lying next to the Passman line.

Of these fifty lots, forty-eight were laid off as regular lots, namely, lots with a uniform width, and two lots, Nos. 47 and 49, as irregular lots.

The plaintiffs' deed calls for lots Nos. 57, 59, 61 and 63, as laid down upon this map. The defendant's title is based upon a deed which calls for lots Nos. 41, 43, 45, 47, 49, 51, 53 and 55.

The point mainly contested at the trial was as to the correct location of the two lots Nos. 55 and 57, the line dividing which was the boundary line of the respective properties of the plaintiffs and defendant.

The place where the plaintiffs claim to locate this dividing line is ten feet distant from that which the defendant contends is the true location, and this ten feet covers the land for which the action is brought.

Both deeds refer to certain lots as laid out on the Clerk and Bacot map. The map, therefore, becomes an essential part of the conveyances. *Glover* v. *Shields*, 32 *Barb.* 374; *Davis* v. *Rainsford*, 17 *Mass.* 207.

The first question to be determined is how wide are the regular lots as they are delineated upon the map.

The plaintiffs insist that the regular lots were laid off twenty-five feet absolute width. The defendant contends that they were plotted with twenty-five feet frontage width. Inasmuch as Palisade avenue does not run at right-angles from the Passman line and gives the lots an oblique frontage, a measurement by the street line would narrow the lots. The difference between the absolute width of the lots as measured by the street and by a line drawn directly across is computed as

four and one-half inches. Between lot No. 57 and the Pass-man line are twenty-nine regular lots. If these lots have an absolute width of twenty-five feet each, then lot No. 57 has the position for which the plaintiffs contend. If, however, they have only a frontgage width, then, as each lot narrows four and one-half inches, the position of lot No. 57 recedes toward the Passman line a distance of ten feet, and the title of defendant, whose deeds calls for lot No. 57 as a boundary, follows it, and so covers the *locus in quo*. No width is writ-ten upon the plots as they appear upon the map, but there is a scale of distances. Upon placing the compasses upon these plotted lots and then applying them to this scale, it appears that all the regular lots are laid off twenty-five feet abso-lute, and not frontage, width.

Every lot, from No. 57 inclusive, to the Passman line, is a regular lot, and this fact, as already stated, brings lot No. 57 into the position claimed for it by the plaintiffs.

A difficulty, however, arises from the appearance in the tes-timony of such circumstances as show that the entire tract is too short to be subdivided into fifty lots, forty-eight of which are regular lots of twenty-five feet absolute width and two of which are irregular lots, which appear upon the map as still wider.

How, then, are the lots to be located? It has been held in cases where sections of regular width were sold and it hap-pened that there was not sufficient land to furnish the num-ber of sections of the required size, that there must be a pro-portionate diminution of each section. *Martz* v. *Williams*, 67 *Ill.* 306; *Mosher* v. *Berry*, 30 *Me.* 83. If the present was such a case, the soundness of this rule would be open for our consideration. But, in this case, two of the lots were clearly irregular. All the evidence in the case relative to the charac-ter of the ground, and of the application of the plan to the ground, shows that these two lots were the divided remnant left after laying off regular lots from the Passman line, at one end, down to No. 49, and, from Hoboken avenue, at the other end, up to No. 47.

I think that each of the regular lots should have its full width and that the two irregular lots must expand or contract in accordance with the size of the remnant left after carving out the forty-eight regular lots. This would leave No. 57 standing so as to cover the ten feet involved in this action.

There is another feature in the description contained in the plaintiffs' deed which fortifies this position impregnably. It contains, in addition to the call for the lots as laid down upon the Clerk and Bacot map, a description as follows: Beginning at a point on the easterly side of Palisade avenue, on a line drawn parallel with and distant six hundred and twenty-five feet southerly from the Passman line; thence running eastwardly, parallel with said division line, two hundred and seventy-five feet, more or less, to the westerly side of Hoboken avenue; thence southerly, along the westerly side of said turnpike, to a point on a line drawn parallel with and distant seven hundred and twenty-five feet southerly from said division line; thence, &c., to the place of beginning.

This description unmistakably fixes the location of the lots included in plaintiffs' deed so as to cover the *locus in quo.*

A line drawn parallel with the Passman line and seven hundred and twenty-five feet therefrom, would cover twenty-nine lots with an absolute width of twenty-five feet.

The most westerly of the twenty-nine lots, as we have seen, is lot No. 57, and the line running parallel with the Passman line, and seven hundred and twenty-five feet distant therefrom, would be its westerly boundary and the dividing line between Nos. 55 and 57, and the division line between the properties of the parties to this action.

The plaintiffs have the elder title and the prior right of location. If, therefore, there was uncertainty in regard to the location of the lots as they stand upon the map, I think this description would fix the location of plaintiffs' lots with certainty in the position for which he contends.

Regarding the legal rights of the parties as they appeared by the deeds, there was nothing to leave to the jury, and,

therefore, the action of the court in directing a verdict was correct.

The counsel for the defendant contends, however, that there was evidence tending to establish two positions in favor of the defendant, which evidence should have been left to the jury. The contention is, first, that there was evidence of title by a practical location of the division line between the parties; and second, that there was evidence of an adverse possession of the *locus in quo* by the defendant and his grantors for over twenty years.

First, then, was there evidence of a practical location by the parties which should have been left to the jury? The evidence offered upon this part of the case was substantially as follows: One Born (who seems to have been the agent of Schlosser, one of the defendant's grantors,) says that he, Born, met Bonnell, one of the grantors of the plaintiffs, in the spring of 1854. At that interview Born told Bonnell that he (Born) was short of land and that he was going to engage another surveyor and have the land surveyed. Born further says that he did engage a surveyor, Mr. Culver, to make the survey. Culver says that he made the survey and was employed to do so by both Born and Bonnell. Culver says that he put up a stone monument to mark the point on Palisade avenue where their properties adjoined, and that Born built a fence in conformity with such monument. It appears that both parties already had their deeds when all this occurred. In viewing the position of the defendant's counsel in insisting that this should have gone to the jury, the first feature of the case which presents itself is the fact that if the view already taken of the description contained in the plaintiffs' deed be correct, then the location of the land covered by it is definitely fixed. The subject matter upon which the deed operates is free from uncertainty. The entire description is unambiguous. Now, I think the admission of evidence of what is termed practical location is permitted only in two instances; first, where the description in the deeds is ambiguous or uncertain in its application to the subject matter of the convey-

ance, and second, where the practical location may operate as an estoppel. Jackson v. Perrine, 6 Vroom 137; Den, Harvy v. Van Houten, 2 Zab. 61; Baldwin v. Brown, 16 N. Y. 359; Tyler Eject. & Adv. Poss. 571.

As there is no ambiguity or uncertainty in the description, the first ground upon which such testimony is admissible does not exist.

Nor is there any element appearing in the case from which an estoppel can be deduced as arising from such location? No improvements were made by the defendant upon land of the plaintiffs by the inducement of any act or work of the plaintiffs which, in law, would exclude the plaintiffs from asserting their right to the ground covered by their deeds.

No error arose by reason of the exclusion of the evidence of practical location from the consideration of the jury.

Again, was there evidence of an adverse possession by the defendant and his grantors which should have been left to the jury? There was some evidence upon this point tending to show possession. That the evidence is not such as would satisfy a court sitting as a jury. seems to me clear. But was there so little as to justify the trial judge in directing a verdict against the claim of the defendant based upon the evidence adduced?

The power of a court to order a non-suit or direct a verdict does not depend upon the absence of all testimony in opposition to the case in favor of which the direction is given. The view that a mere scintilla of evidence was sufficient to carry a case to the jury is completely exploded in the English courts.

The cases are reviewed in the opinion of Willes, J., in the case of Ryder v. Wombwell, heard in the Exchequer Chamber and reported in L. R., 4 Exch. 32. The rule deduced from them and applied to the cause then under consideration was this: Is there evidence from which the jury could reasonably come to the conclusion that the facts sought to be proved are established?

In the case of Giblin v. McMullen, L. R., 2 P. C. 317, 335, Lord Chelmsford approved the rule enunciated in the

last-named case in the following words:   A course of recent decisions, most of which are referred to in Ryder *v.* Wombwell, has established a more reasonable rule, viz., that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.

The rule laid down in these cases is adopted by the Supreme Court of the United States in the following cases : *Improvement Co.* v. *Munson,* 14 *Wall.* 442, 448 ; *Pleasants* v. *Fant,* 22 *Wall.* 116 ; and in the courts of New York and Maryland, in the following cases : *Deyo* v. *N. Y. Central R. R. Co.,* 34 *N. Y.* 9, and *Davis* v. *Davis,* 7 *Harr. & J.* 36.

This rule is the equivalent, as I understand it, of the statement in the opinion in the case of *Hartman* v. *Alden's Ex'rs,* 5 *Vroom* 518, that the test is whether the verdict, if rendered otherwise than as ordered, would have been set aside, or the more specific, and probably more accurate statement in the case of *Denny* v. *Williams,* 5 *Allen* 1, that if the case is such that the court would set aside any number of verdicts, then the court should instruct.

I do not think that under this rule the defendant was entitled to go to the jury.

A possession which is permitted to prevail against a clear title by record should be clearly proven to be accompanied by all the requisites of an adverse occupation, including positive evidence of the continuity and territorial extent of the possession.

The possession here claimed is, that the Schlosser part was fenced by Born in 1853, and remained so for over twenty years.   Born bought in 1853, and got a deed for it for Mrs. Schlosser about three years later.

Born says that the present north fence is where he put the north fence, at the time that he built a part of the north fence, viz., the boundary fence was picket and a part posts and rails.   He gave up possession to Noyes in 1861, and he

sold to Pine in 1867, who sold to Shannon in 1875. Noyes says that he never went to see the fence. Pine is not called as a witness.

There was no evidence as to the condition of this fence for fifteen years, except that of a Mr. Curry, who says that he pastured a cow on the lower part of that lot for a number of years, and upon an adjoining lot for four years, and that he was to keep up this fence.

But it is apparent that the exact location of this fence, the part included in the boundary of the pasture and lot, was not a fixity. Mr. Baldwin says that Pine built a new fence from Hoboken avenue up to an oak tree, and the line of this fence was about where plaintiffs claim the boundary line to be. This is one of the plaintiffs' witnesses, it is true, but Curry says that Pine built a fence where he quarried the lot and knocked all the old fence down. Curry says "that there was a part of the old fence there when he left, and there was a jog off to the south after Pine fixed it; that there was a jog to the north and everything. The height of the fence would go two or three feet. It was every which way, and especially when the wind was blowing, it was all a-jogging."

It appears from the evidence that the greater part of this lot toward Hoboken avenue was rocky, and that the fencing was in and out, wherever they could find a place where a post-hole could be dug.

I do not see how, under the evidence, a jury could fix upon the limits of any twenty years' possession, arising by the act of fencing alone, and I think that a verdict for the defendant, based upon such possession, could not stand. In this view the direction was correct.

Rule discharged.